**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

|  |  |
|---|---|
| METRO MAIL SERVICES, INC.,<br><br>   *Plaintiff,*<br><br>v.<br><br>PITNEY BOWES, Inc.,<br><br>   *Defendant.* | )<br>)<br>)<br>)<br>)<br>)  Civil Action No. 1:16-cv-1416<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION

This matter comes before the Court on Defendant Pitney Bowes, Inc.'s ("PBI") Motion to

Limit Damages and to Dismiss Counts II and III of Plaintiff Metro Mail Services, Inc.'s

("MetroMail") First Amended Complaint ("FAC"). Dkt. No. 26. The dispute arises out of an

allegation that Defendant breached its contract with the Plaintiff, fraudulently induced Plaintiff

to enter into the contract, and engaged in unfair trade practices pursuant to Connecticut law. For

the reasons discussed below, the Court GRANTS IN PART and DENIES IN PART the Motion.

Count II is hereby DISMISSED and Defendant shall file an answer to Counts I and III of the

FAC within ten (10) days of the entry of the order accompanying this memorandum opinion.

### I. Background

Plaintiff and Defendant are both engaged in the United States postage meter industry.

United States Postal Service Regulations prohibit the sale of postage meters used for printing

official U.S. postage. Rather, the meters must be rented from authorized manufacturers or third-

party dealers. Both parties are engaged in the leasing of the meters, and attendant features like

scales, "sealers", "feeders", and "inserters" to customers. Pitney also manufactures meters for

sale and maintains an approximately 75% market share, against only three competing manufacturers.

Plaintiff's owner, Luong Nguyen, worked as a service technician for Defendant from 1988 to 2000, at which point he left to form Plaintiff, Metro Mail Services Inc. Initially, Plaintiff's services were limited to repairing its customers' postage meters which were leased from other vendors. In 2003, Plaintiff entered into a dealer agreement with FP Mailing Solutions ("FP") a manufacturer of mailing equipment whereby Plaintiff leased FP meters and other equipment directly to its customers. The dealer agreement with FP placed Plaintiff in competition with Defendant's business. Plaintiff used its business strategy and its status as a qualified Small Business Enterprise to secure government contracts for which Defendant could not compete.

Beginning in the fall of 2011, Defendant's Vice President for the Dealer Network, John Vavra, began recruiting Mr. Nguyen to sign Plaintiff as a dealer for Defendant's postage meters. The solicitations included multiple meetings in the DC Metro Area as well as in Connecticut where Defendant is based. Mr. Vavra also invited Mr. Nguyen on golf outings in Florida and Virginia where the dealer relationship was discussed. Mr. Nguyen also visited Defendant's executives at their Connecticut headquarters in the fall of 2012. In this meeting, Mr. Nguyen expressed concern about Defendant using its direct sales force to compete with Plaintiff. The executives assured Mr. Nguyen that they were committed to the dealer network and were reducing their direct sales force.

In November 2012, Plaintiff and Defendant entered into a dealer agreement, the "PBI-Dealer Agreement" which permitted Plaintiff to serve as a dealer for meters manufactured by Defendant. Pursuant to the contract, Defendant agreed to pay "[a]ny commission or fee due to

Dealer from [Defendant] for Dealer's role in any such transaction with [an agency or instrumentality of the United States government] shall be paid by [Defendant] to Dealer in accordance with the Policies and Procedures Manual." Dkt. No. 1, Exh. A, § 3.03(4). Defendant agreed to not use Plaintiff's customer information to market products directly to those customers unless it had Plaintiff's permission during the term of the agreement and for one year after. However, the agreement was not exclusive and did not prohibit Defendant from continuing to pursue new customers also targeted by Plaintiff. Pursuant to the agreement, Plaintiff also agreed to take out of service over 700 FP postage meters that it had leased to customers to be replaced with Defendant's meters. Doing so exposed all of Plaintiff's customer identities to Defendant.

After entering into the agreement, Defendant began directly soliciting Plaintiff's customers. Defendant would offer a lower discount on the its products than Plaintiff could offer under the terms of the PBI-Dealer agreement. For example, on a July 2016 bid for a contract with the U.S. Patent and Trademark Office, Defendant bid at a price 21% lower than Plaintiff's cost for the same products. Defendant also offered free maintenance services and made disparaging statements to Plaintiff's customers about the quality and capacity of Plaintiff's maintenance services. Plaintiff notified Defendant in mid-2015 that it objected to this conduct but continued to operate under the PBI-Dealer Agreement.

By letter dated July 21, 2015, the parties entered into an accord to modify the PBI-Dealer Agreement. The revised agreement granted Plaintiff pricing for Defendant's products consistent with the prices offered by the Defendant to its Government Administration Services clients. Plaintiff alleges that despite this new agreement, Defendant further interfered with the contractual relationship in a number of ways. First, Defendant protested the award of a "small business set aside" contract awarded to Plaintiff claiming that it should be allowed to directly bid

on the contract. The bidding process was reopened. Plaintiff ultimately won the bid during the rebidding process but at greater cost. Second, Defendant refused to pay a 27% required commission on a contract between Plaintiff and the Department of Veterans Affairs. Third, Defendant "co-opted" Plaintiff's largest account, resulting in substantial damages to Plaintiff. Fourth, Defendant employed telemarketers to regularly market sales, upgrades, supplies, and services to Plaintiff's customers in breach of the PBI-Dealer Agreement.

By mid-July 2016, Plaintiff had converted almost all of its FP postage meters to Defendant's meters. Around the same time, Defendant notified Plaintiff that it was not going to agree to a renewal of the PBI-Dealer Agreement, terminating the parties' relationship effective November 1, 2016.

Plaintiff filed a Complaint on November 10, 2016 alleging three counts: breach of Contract (Count I), violation of the Connecticut Unfair Trade Practices Act ("CUTPA") (Count II), and Fraudulent Inducement (Count III). Defendant moved to dismiss Counts II and III pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim and to limit damages. Dkt. No. 9. The Court conducted a hearing in this matter on January 13, 2017 and dismissed Counts II and III without prejudice and reserved comment on the limitation of damages issue. Dkt. No. 21. Plaintiff filed the FAC on January 27, 2017. Dkt. No. 23. Defendant again moved to dismiss Counts II and III and to limit damages. Dkt. No. 26.

## II. Legal Standard

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 550 (2007). A motion to dismiss pursuant to Rule 12(b)(6) must be considered in combination with Rule 8(a)(2), which requires

"a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R.

Civ. P. 8(a)(2), so as to "give the defendant fair notice of what the ... claim is and the grounds

upon which it rests." *Twombly*, 550 U.S. at 555. While "detailed factual allegations" are not

required, Rule 8 does demand that a plaintiff provide more than mere labels and conclusions

stating that the plaintiff is entitled to relief. *Id.* Because a Rule 12(b)(6) motion tests the

sufficiency of a complaint without resolving factual disputes, a district court "'must accept as

true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences

in favor of the plaintiff.'" *Kensington Volunteer Fire Dep't v. Montgomery County*, 684 F.3d

462, 467 (4th Cir. 2012) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d

435, 440 (4th Cir. 2011)).

For allegations of fraud, Federal Rule of Civil Procedure 9(b) requires the plaintiff to

"state with particularity the circumstances constituting fraud or mistake." *Harrison v.

Westinghouse Savannah River Co.*, 176 F.3d 776, 783-84 (4th Cir. 1999). A lack of compliance

with Rule 9(b)'s pleading requirements is treated as a failure to state a claim under Rule

12(b)(6). *Smith v. Clark/Smoot/Russell*, 796 F.3d 424, 432 (4th Cir. 2015).

### III. Analysis

Defendant moves the Court to dismiss Count II (violation of the Connecticut Unfair

Trade Practices Act) and Count III (Fraudulent Inducement) because Plaintiff has failed to state a

claim for either of these counts. Defendant also contends that the language in the PBI-Dealer

Agreement and controlling case law requires a dismissal of any claims for punitive or

consequential damages. Finally, Defendant argues that the economic damages award is limited

by contract to no more than the total payments that would have been made under the contract in

the last six months and punitive damages are limited to $350,000 pursuant to Virginia law. This

memorandum addresses each issue in turn.

### A. Count II – Violation of the Connecticut Unfair Trade Practices Act

Defendant seeks dismissal of Count II for three reasons. First, Defendant contends that CUTPA is a tort action for purposes of choice of law analysis pursuant to which the alleged injury is governed by Virginia substantive law which does not recognize the CUTPA action. Second, even if CUTPA does apply to the agreement it cannot be applied in this case because all of the allegedly unfair conduct occurred in Virginia. Third, Plaintiff fails to allege "substantial aggravating circumstances" as required for a CUTPA unfair trade practice claim, and its claim is merely duplicative of its breach of contract claim in Count I.

Respecting Defendant's first argument, the parties dispute whether Virginia or Connecticut law applies to the CUTPA claim. Because federal jurisdiction for this case depends on diversity of citizenship, "the applicable law must be determined by the choice of law rules in the forum state." *Brendle v. General Tire & Rubber Co.*, 408 F.2d 116 (4th Cir. 1969). Determining the choice of law rules for the forum state in this case is complicated because the parties dispute whether a CUTPA claim is an action in tort or contract.

Defendant contends that CUTPA is a tort action created by statute. Accordingly, Defendant argues that Virginia's choice of law rule for torts, which applies the law of the state where the harms were suffered, should apply to the case. Defendant contends that it is irrelevant that its agents and headquarters are in Connecticut because the harm occurred in Virginia where Plaintiff's business and its relationship with its Virginia-area customers were affected. Anticipating a likely counterargument, Defendant also contends that the parties' choice of law clause in the PBI-Dealership Agreement does not require the application of Connecticut law to a

6

tort action.[1]  Defendant points to a nearly identical choice of law provision in *Western Dermatology Consultants, P.C. v. VitalWorks, Inc.* 146 Conn. App. 169 (2013) *rev'd in part* 322 Conn. 541 (2016).[2]  In *Western Dermatology*, the appeals court found that the choice of law provision did not govern CUTPA claims because "[t]he applicability of CUTPA is not an issue of construction or interpretation of the contract." *Id.* at 203.  In Defendant's view, CUTPA is a tort action so Virginia's choice of law for torts applies and the choice of law provision in the PBI-Dealer Agreement does not apply.  Accordingly, Defendant argues that the CUTPA claim is not viable because the choice of law rule requires the application of Virginia substantive law and prohibits the imposition of a statutory right of action based on Connecticut law.

Plaintiff counters that CUTPA is a contract law claim subject to Virginia's contract choice of law provisions and the choice of law provision in the Agreement.  Plaintiff does not dispute that CUTPA is ostensibly a tort cause of action but nevertheless contends that Virginia courts apply principles of contract law to statute-based causes of action, like CUTPA, and that courts in this district have analyzed statutes similar to and including CUTPA using contract law principles.

Specifically, Plaintiff points to two decisions from the Supreme Court of Virginia in support of its argument. In *Buchanan v. Doe*, the Supreme Court held that a West Virginia uninsured motorist statute requiring proof of contact in automobile accidents was a matter of contract law.  246 Va. 67, 74 (1993).  The statutory action arose out of an accident in West Virginia concerning a Virginia motorist who signed an insurance contract in Virginia. *Id.* at 68-69.  The court noted that the purpose of the proof of contact provision was to "protect[] UM

---

[1] The provision states in relevant part that "[t]his Agreement shall be governed by and construed according to the laws of the State of Connecticut without regard to its conflict of laws principles." Dkt. No. 1, Exh. 1 at 16.
[2] The provision in *W. Dermatology Consultants* read in relevant part that "[t]his [a]greement shall be construed and interpreted in accordance with the laws of the [s]tate of Connecticut and any dispute shall be resolved in a forum located in the [s]tate of Connecticut." 146 Conn. App. at 198 n.7.

insurers against their insureds' fraudulent UM claims"—a matter of contract between the policy holder and the insurance company. *Id.* at 73. Similarly, in *Dreher v. Budget Rent-A-Car Sys., Inc.*, the Supreme Court, relying on the logic in *Buchanan*, applied Virginia's contract choice of law rule to an action brought under a New York statute for personal injuries in automobile accidents. 272 Va. at 398. The court determined that "the New York statute resembles a contractual provision imposed by statute designed to regulate the relationship between a vehicle owner and an individual operating the vehicle with permission." *Id.* Specifically, the statute "regulated the relationships between motor vehicle owners and their permittees…a contractual duty upon the owner of a vehicle having no relation to the underlying tort action." *Id.* at 399 (quotations omitted). Accordingly, contract choice of law rules applied and the Virginia courts were required to apply New York substantive law. *Id.*

Plaintiff also points to two decisions in this district that purportedly support the application of contract law to CUTPA claims. In *Corinthian Mortgage Corp. v. Choicepoint Precision Marketing, LLC*, a court in this district analyzed choice of law for claims brought under a Massachusetts statute materially analogous to the Connecticut statute. 1:07CV832 (E.D. Va. Apr. 4, 2008). The court held that statutorily created claims involving fraud and misrepresentation were subject to Virginia tort choice of law because they mirrored claims recognized at common law. *Id.* at *9. On the other hand, claims involving wrongful use of proprietary data sounded in contract because they did not exist at common law. *Id.* at *11-12. In *Freedman v. Am. Online*, another court in this district engaged directly with choice of law provisions applicable to a CUTPA claim. 325 F. Supp. 2d 638 (2004). The CUTPA claim arose out of the contract because "by bringing the CUTPA claim, [plaintiff was] effectively asserting 'his' rights under the Privacy Policy in violation of" the parties' contract. *Id.* at 654. The

parties' forum selection clause required application of Virginia law to contract disputes. *Id.* But because Virginia substantive law applied through the choice of law clause in the agreement, the CUTPA claim could not be sustained. *Id.*

Plaintiff contends that CUTPA is analogous to the insurance statutes in *Buchanan* and *Drehr* and should be analyzed consistent with *Corinthian Mortgage* and *Freedman* because CUTPA is a legislatively prescribed system for protecting victims from unfair trade practices based on a contractual relationship between the litigating parties. On this reading, the CUTPA claim sounds in contract and Virginia's contractual choice of law rules apply. In turn, substantive Connecticut law would apply to the claim as contemplated in the choice of law provision of the Agreement.

Virginia's choice of law rule in tort actions is *lex loci delicti*, "meaning the law of the place of the wrong governs all matters related to the basis of the right of action". *Dreher v. Budget Rent-A-Car Sys., Inc.*, 272 Va. 390, 395 (2006) (citations omitted). The place of the wrong is "the place where the last event necessary to make an act liable for an alleged tort took place." *Quillen v. International Playtex, Inc.*, 789 F.2d 1041, 1044 (4th Cir. 1986) (quotations omitted). For actions sounding in contract and subject to a contractual choice of law provision, "[t]he scope of the choice of law provisions . . . must be determined by the law of the state chosen by the parties in the contract." *Bunker Holdings Ltd. V. Green Pac. A/S*, 346 F. App'x 969, 973 (4th Cir. 2009). If Connecticut law applies through the choice of law provision in the PBI-Dealer Agreement, the choice of law clause may extend to tort claims arising out of or relating to the contract. *See Travel Services Network, Inc. v. Presidential Financial Corp.,* 959 F. Supp. 135, 146 (D. Conn. 1997) ("A broadly worded choice-of-law provision in a contract may govern not only interpretation of the contract in which it is contained, but also tort claims

arising out of or relating to the contract.").

But Plaintiff's ability to sustain a cause of action under CUTPA turns on the issue considered in *Corinthian*—whether the CUTPA claim brought by Plaintiff is based on a duty imposed by contract or is analogous to independent duties reflected in the common law torts of Virginia. *Corinthian*, 1:07CV832, at *11. The Connecticut Supreme Court has held that CUPTA is "intended to provide a remedy that is *separate and distinct* from the remedies provided by contract law when the defendant's contractual breach was accompanied by aggravating circumstances." *Ulbrich v. Groth*, 310 Conn. 375, 411 (2013) (emphasis added). Not only does the Connecticut Supreme Court's characterization of CUTPA support a finding that Count II does not arise under contract law, but, as with the fraud and misrepresentation claims in *Corinthian*, Count II is analogous to the tort of fraud under Virginia common law. *See Corinthian*, 1:07CV832, at *9 ("fraud…is purely a tort . . . [t]he character of fraud is not changed from tort to contract merely because the parties are also engaged in a contractual relationship.") (quotations and citations omitted). For this reason, the CUTPA claim in this case is distinguishable from the challenges in *Buchanan, Dreher*, and *Corinthian Mortgage* all of which addressed statutory provisions which were not redressed by tort law. *Buchanan*, 246 Va. at 72 (finding that "there is nothing in the tort law of either state which requires that injury be accompanied by physical contact" as required by the West Virginia statute at issue); *Dreher*, 272 Va. at 399 (finding that contract law rules apply where the "contractual duty upon the owner of a vehicle [has] no relation to the underlying tort action."); *Corinthian*, 1:07CV832, at *11-12 (finding that claims involving wrongful use of proprietary data sounded in contract because they did not exist at common law).

The construction of the FAC supports this finding. Plaintiff alleges the same conduct in

Count II for violation of CUTPA as in Count III for fraudulent inducement. That conduct culminated in the financial harms suffered by Plaintiff with respect to ongoing and prospective customer relationships here in Virginia. *See Feeley v. Total Realty Mgmt.*, 660 F. Supp. 2d 700, 714 (E.D. Va. 2009) (finding with respect to unfair and deceptive trade practices laws for Virginia, North Carolina, and South Carolina "the place of the injury is each plaintiff's state of residence for the purposes of claims of unfair and deceptive trade practices" because the financial injury took place there). Accordingly, Plaintiff's CUTPA claim sounds in tort. It follows that Virginia's tort choice of law rule "*lex loci delicti*" applies and Virginia substantive law governs the unfair practices claim.[3] CUTPA is not a claim recognized under Virginia substantive law.[4] Accordingly, the CUTPA action cannot be sustained.

Because the choice of law rule prohibits Plaintiff from bringing a claim under CUTPA, the Court need not consider the extraterritorial application of CUTPA or whether Plaintiff has sufficiently pleaded a claim under CUTPA.

### B. Count III – Fraud in the Inducement

Defendant argues that Count III fails to state a fraud claim for two primary reasons. First, Plaintiff fails to allege either a material misrepresentation or justifiable reliance as required under Virginia law. Second, Plaintiff fails to plead fraud with sufficient particularity in accordance with Federal Rule of Civil Procedure 9(b).

The parties agree that Virginia law applies to this cause of action because Plaintiff

---

[3] While not binding on the Court this finding accords with how this matter would be resolved under Connecticut choice of law rules. *See Macomber v. Travelers Prop. & Cas. Corp.*, 277 Conn. 617, 640 (2006) ("Under Connecticut choice of law rules, for the plaintiff's claims that sound in tort, namely, civil conspiracy, unjust enrichment and CUTPA, we apply the law of the state in which the plaintiff was injured, unless to do so would produce an arbitrary or irrational result.").

[4] Plaintiff cites two cases for the proposition that a CUTPA claim can be brought by out of state residents against a Defendant located in Connecticut. *See Metro. Enter. Corp. v. United Techs. Int'l, Corp., Pratt & Whitney Large Commercial Engines Div.*, 2004 WL 1497545 (D. Conn. June 28, 2004); *see also Diesel Injections Serv. V. Jacobs Vehicle Equip.*, 1998 WL 950986 (Conn. Super. Ct. Dec. 4, 1998). These cases were brought *in* Connecticut and were subject to Connecticut substantive law. Thus the two cases are inapposite to this case.

suffered its alleged losses in Virginia, Plaintiff's principal place of business. *See Cars Unlimited II, Inc. v. Nat'l Motor Co., Inc.*, 472 F. Supp. 2d 740, 750 (E.D. Va. 2007) (holding that the law of the defrauded party's headquarters governed the fraud claim). To set forth a claim for fraud in the inducement in Virginia, a plaintiff must prove by clear and convincing evidence that: (1) the defendant made a material misrepresentation for the purpose of procuring a contract; (2) the plaintiff relied on the misrepresentation; and (3) the plaintiff was induced by the misrepresentation to enter into the agreement. *Evaluation Research Corp. v. Alequin*, 247 Va. 143, 148 (1994). In addition, the promise upon which the claim is based must have been false when made. *See Station #2, LLC v. Lynch*, 280 Va. 166, 173 (2010) ("Station # 2 does not allege that Gadams' and Marathon's promise was false when made . . . [a]ccordingly, Station # 2's allegations were insufficient to establish a claim of fraudulent inducement."). Fraud in the inducement also requires that "the circumstances constituting fraud be stated with particularity." Fed. R. Civ. P. 9(b). The matters to be stated with particularity include the "time, place and contents of the false representations, as well as the identity of the person making the misrepresentations and what he obtained thereby". *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) (quotations and citations omitted). However, consistent with the "four purposes" of Rule 9(b), the Court "should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Id.*

Defendant contends that Plaintiff has failed to satisfy any of the required elements under Virginia law. Specifically, Defendant argues that nothing in the FAC suggests that it did not intend to fulfill its contractual duties at the time it entered into the Agreement. Defendant notes

that the parties performed under the Agreement as contemplated for four years—implying that no misrepresentations occurred at the time that the Agreement was formed. Defendant also argues that the allegations of fraud in the Complaint are conclusory and do not meet the particularity requirement of Rule 9(b). Specifically, Defendant contends that the Complaint does not allege who made fraudulent statements or misrepresentations and does not provide the times or places where those statements occurred.

Plaintiff counters that where a promisor makes a promise that, when made, he has no intention of performing, that promise is considered a misrepresentation of present fact and may form the basis of actual fraud—a proposition adopted by the Virginia Supreme Court in *Station #2*. *See* 280 Va. at 172. Plaintiff also points to this district's decision in *Stone Castle Fin., Inc. v. Friedman, Billings, Ramsey & Co.*, 191 F. Supp. 2d 652, 662 (2002). In *Stone Castle*, the plaintiff satisfactorily alleged fraud when it represented that it provided confidential information to the defendant based on assurances that the information would be used for a limited purpose where in fact it was used for additional purposes without plaintiff's authorization. *Id.* at 662-663. The parties entered into a confidentiality agreement whereby the defendant agreed that it would only use plaintiff's confidential information to evaluate a particular business opportunity and would not share the information for one year. *Id.* at 654. One of the defendant's agents expressly made this representation to the plaintiff. *Id.* The agreement also prohibited the defendant from pursuing merger or acquisition targets already identified in the confidential business plan provided by the plaintiff. *Id.* The plaintiff alleged that defendant never intended to abide by the contract and that the defendant used the confidential information to benefit one of plaintiff's competitors. *Id.* The court found that the plaintiff had sufficiently plead the necessary elements when it "sufficiently allege[d] that it gave its information to [defendant] in reliance on

13

[defendant's] assurances that it would not share the information" and that the representations were pleaded with particularity, noting the approximate date that an employee of the defendant represented that he would use the confidential information only for the limited, permitted purpose. *Id.* at 662-63. The express promise made by defendant's employee was alleged to be a misrepresentation of his intent to abide by the parties' agreement and therefore supported a fraud claim. *Id.* at 663.

Plaintiff's reliance on *Station #2* does not advance its argument as a matter of law. While the court in *Station #2* observed the general principle that a promise with no intention to perform is a misrepresentation of present fact, the court sustained the district court's demurrer because the plaintiff failed to plead that the statements were false when made. *Station #2*, 280 Va. at 172. Thus, *Station #2* reaffirmed the well-settled Virginia requirement that a fraud claim allege misrepresentation of a present and pre-existing fact at the time of the fraudulent conduct. *See, e.g.*, *Abi-Najm v. Concord Condo., LLC*, 280 Va. 350, 362 (2010) ("[A]n action based upon fraud must aver the misrepresentation of pre-existing facts, and cannot ordinarily be predicated on unfulfilled promises or statements as to future events. Were the general rule otherwise, every breach of contract could be made the basis of an action in tort for fraud.") (quoting *Lloyd v. Smith*, 150 Va. 132, 145 (1928)).

The allegations in the FAC, however, are factually analogous to *Stone Castle*. The November 2012 Agreement between the parties provided that Defendant "agrees not to use such Customer Information to market PBI Products, services or supplies to such Dealer Customers." Plaintiff, like the plaintiff in *Stone Castle*, alleges that it relied on the representation of confidentiality when it turned over its customer information to Defendant for the limited purpose of replacing its FP postage meters with Defendant's postage meters. *See Stone Castle*, 191 F.

Supp. 2d at 663.  As in *Stone Castle*, the confidential information was allegedly used for

unauthorized purposes—in this case Defendant's solicitation of Plaintiff's customers.  Plaintiff

alleges instances in May 2013 (Maxim Health Service lease renewal) and July 2016 (bid for a

contract with the U.S. Patent and Trademark Office) where Defendant, through its sales staff,

used Plaintiff's customer information to undercut Plaintiff's relations with customers.  Plaintiff

also alleges that there were ongoing attempts by Defendant's direct sales force to undercut

Plaintiff's business.  Defendant's alleged improper use of the customer information to undercut

Plaintiff in contract negotiations as early as May 2013 strongly suggests that Defendant never

intended to perform on the promise not to market its services to Plaintiff's current customers and

sustains the fraud cause of action at this stage.

     Defendant attempts to distinguish *Stone Castle* because in that case the agreement was

"almost instantly violated" whereas here, the parties labored under the agreement for numerous

years before Plaintiff filed the Complaint.  *Id.* at 654; Dkt. No. 33 at 8.  This argument does not

distinguish *Stone Castle* or abrogate the fraud claim.  The court's reference to an "instant

violation" in *Stone Castle* was merely a recitation of the plaintiff's allegation.  *See id.*

("*According to Stone Castle*, FBR and Nelligan never intended to abide by the terms of the

Agreement and almost instantly violated the Agreement") (emphasis added).  The court did not

subsequently find that this instantaneous violation was a necessary condition for the fraud claim.

Rather, the allegation that representations were made at the time the confidentiality agreement

was formed and were subsequently breached was sufficient to state a claim.  *See id.* at 662-63.

Further, the passage of time between the original agreement and the filing of the Complaint does

not establish that there was no fraud at the time the contract was made.  The complaint in *Stone

Castle* was not filed until August 3, 2001, over two years after the parties entered into their

confidentiality agreement. *See Stone Castle Fin., Inc. v. Friedman, Billings, Ramsey & Co.*, 1:01CV1220, Dkt. No. 1. Here, Plaintiff filed the Complaint more than four years after signing the PBI-Dealer Agreement. However, Plaintiff has alleged that the conduct which evinces the intent to not abide by the agreement was ongoing for many years prior to the Complaint. There may be any number of reasons why Plaintiff did not bring a lawsuit when it initially concluded that Defendant had misrepresented the Agreement, but this delay before bringing suit does not result in a waiver of the fraud claim.

Plaintiff must still meet the particularity requirement of Rule 9(b). To this end, Plaintiff avers in the FAC that in September 2012, Mr. Nguyen met with Mr. Vavra, Defendant's Vice President for the Dealer Network, during which, and in response to a question about whether Defendant sought to put Plaintiff out of business through the dealer agreement, Mr. Vavra stated that Defendant was committed to Plaintiff's success especially in the federal government market. Dkt. No. 23 at ¶ 22. Also in the fall of 2012, Mr. Nguyen met with executives of the Defendant who, in response to a question about competition between dealers and Defendant's direct sales force, stated that they were reducing their direct sales force and were committed to the dealer network. Dkt. No. 23 at ¶ 23.[5] These representations by the Defendant, taken as true, manifest fraud because Defendant's direct sales force used Plaintiff's customer information to under-bid Plaintiff on its existing customers.

In addition to the new allegations in the FAC, Plaintiff pleaded the particularity of the fraudulent conduct through the PBI-Dealer Agreement, the original of which is attached to the FAC. Because the Agreement is the source of the fraud, the Defendant and the Court are on

---

[5] The additional facts alleged in the FAC that numerous employees of the Defendant met and socialized with Mr. Nguyen to induce him to become Defendant's dealer are not material to whether Pitney made any fraudulent representations in the PBI-Dealer Agreement. Plaintiff did become a dealer for Defendant. The issue is whether fraudulent representations were made that customer information would not be used to compete with Defendant's current customers.

notice of the content and date of the fraudulent inducement. Mr. Vavra signed the agreement on November 1, 2012 and it included the promise not to use customer information to market products to Plaintiff's customers or for other unauthorized uses. *See Stone Castle*, 191 F. Supp. 2d at 664 ("Here, the promise made by Nelligan [to preserve confidential information], as alleged, constitutes a misrepresentation of his intent to abide by the Agreement. As such, the claim for fraud survives."). As discussed above, Defendant has pleaded dates during which Defendant's fraudulent inducement was revealed through conduct allegedly inconsistent with the Agreement. Thus the Court can be satisfied that the Defendant has been made aware of the particular circumstances for which it will have to prepare a defense at trial—those surrounding the consummation of the PBI-Dealer Agreement and the Maxim and Patent and Trademark Office deals—and Plaintiff has pleaded substantial prediscovery evidence of the facts. *See Harrison*, 176 F.3d at 784 (requiring a showing of the "time, place and contents of the false representations, as well as the identity of the person making the misrepresentations" to satisfy Rule 9(b)).

Because Plaintiff has sufficiently pleaded the elements of a claim for fraud in the inducement with particularity, the Motion must be denied with respect to this count.

## C. Limitation on Damages

Defendant argues that damages for breach of contract should be limited based on the unambiguous language in the PBI-Dealer Agreement to not "exceed the amount of payments made by the [non-infringing party] in the six months preceding the claim giving rise to such liability" and that "consequential, incidental, punitive, special, exemplary or other indirect or special damages or losses" should be prohibited. Dkt. No. 1, Exh. 1 at 11. Defendant also argues that if punitive damages are not prohibited by the contract, they should be capped at

$350,000 pursuant to Virginia law.

### 1. Contractual Limitations on Damages

Section 6.06 of the Agreement titled "Limitation of Liability" provides that: "Except for the dealer's obligations under Sections 6.02, 6.03 and 6.04 of this agreement, neither [Defendant] nor dealer may recover any consequential, incidental, punitive, special, exemplary or other indirect or special damages or losses (such as but not limited to loss of profits, goodwill, or business opportunity) even if [Defendant] or dealer has been advised of the possibility of such damages or losses and regardless of what legal or equitable theory may be asserted." *See* Dkt. No. 1, Exh. A § 6.06. The Agreement also provides that "in no event shall the total liability of PBI or Dealer or any of their affiliates under this agreement exceed the amount of payments made by the other in the six (6) months preceding the claim giving rise to such liability." *Id.* The limitations of § 6.06 do "not apply to indemnification sought with respect to (a) third party claims under Section 6.03, or (b) relief sought under Section 6.02 with respect to breaches of confidentiality." *Id.* Defendant contends that both of these exceptions to § 6.06 only apply to indemnification for *third-party* claims.

The parties agree that Connecticut law governs the interpretation of the PBI-Dealer Agreement. Under Connecticut contract law, "the intent of the parties is to be ascertained by a fair and reasonable construction of the written words." *Barnard v. Barnard*, 214 Conn. 99, 110 (1990) (internal quotation marks omitted).

Plaintiff has alleged that Defendant violated the provisions of § 6.02. Plaintiff rejects the argument that relief under § 6.02 is limited to third-party claims. The Court agrees. Defendant's attempt to apply the phrase "third party claims" to both clauses (a) and (b) stretches grammatical convention. If the Defendant, a sophisticated participant in the industry, wanted the "third party"

designation to apply to clauses (a) and (b) then they could have easily moved the language outside of the limiting clause "(a)". The drafting decision to limit the phrase to "(a)" is indicative of the intent of the document. Even if the language is ambiguous, Connecticut law provides that the limitation provision will be construed "most strongly against the party whose language it is and for whose benefit it was inserted." *Sturman v. Socha*, 191 Conn. 1, 9 (1983); *see also WiFiLand, LLP v. Hudson*, 153 Conn. App. 87, 99 (2014) ("the clause should be construed against the plaintiff as the party who drafted the contract").

Defendant also contends that the word "indemnification" in § 6.06, which does modify clauses (a) and (b), restricts exceptions to the limit on liabilities to claims against third-parties. In *Heyman Assocs. No. 5, L.P. v. FelCor TRS Guarantor, L.P.*, the Connecticut Appellate Court found that an "action for indemnification is one in which one party seeks reimbursement from another party for losses incurred in connection with the first party's liability to a third party." 153 Conn. App. 387, 414 (2014) (quoting *Amoco Oil Co. v. Liberty Auto & Electric Co.*, 262 Conn. 142, 148 (2002)). But the court also found that "the phrase 'indemnify and hold . . . harmless' may support a claim between the contracting parties." *Id.* at 414-15. The present contract language presents a third scenario, where the contract provides that damages and remedies "limitations shall not apply to indemnification sought" under §§ 6.02 and 6.03.

Plaintiff raises a number of objections. First, Plaintiff contends that "to indemnify" as defined by Black's Law Dictionary and adopted by the Connecticut Court of Appeals means "[t]o reimburse (another) for a loss suffered because of a third party's *or one's own act or default.*" *Heyman Assocs. No. 5, L.P.*, 153 Conn. App. at 415 (quoting Black's Law Dictionary, "Indemnify" (9th Ed. 2009) (emphasis added)). This plain meaning of indemnify encompasses more than just third party claims. However, Plaintiff's reference to the Black's Law definition of

"indemnify" is only instructive rather than binding on the court. While it sets forth a general-use definition, it does not resolve how specific indemnity language should be interpreted by the Court. *See Heyman*, 153 Conn. App. at 414-415 (comparing the legal treatment of different types of indemnity provisions).

Second, Plaintiff argues that indemnification should be read to encompass claims between the parties because an interpretation limited to third parties in this case "would render portions of the indemnification provision superfluous." *Id.* at 416-17. Specifically, Plaintiff notes that § 6.5 of the Agreement includes two indemnification provisions the first of which requires Plaintiff to indemnify and hold harmless Defendant "against any costs . . . arising out of" Plaintiff's breach of the agreement or related tortious conduct. Dkt. No. 1, Exh. 1 at 10. The second provides that Defendant "shall indemnify, defend and hold Dealer harmless from all claims and suits . . . against Dealer by a third party alleging infringement[.]" Dkt. No. 1, Exh. 1 at 11. The same issue arises in § 6.06 which excludes the section from "indemnification sought with respect to (a) third party claims . . . (b) relief sought under section 6.02." *Id.* Though each of these provisions concerns indemnification, the contract specifically indicates where indemnification relates to third-party claims and where it does not. If Defendant intended that all references to indemnification referred to claims by third parties, the language in part two of § 6.5 and in part (a) of § 6.06 would be superfluous.

As discussed above, Defendant is a sophisticated party and the ambiguous use of "third party" in the Agreement is construed against it as the drafter. "Generally, a word used by the parties in one sense will be given the same meaning throughout the contract in the absence of countervailing reasons." *Meeker v. Mahon*, 167 Conn. App. 627, 634-35 (2016). Defendant's use of the phrase "third party" in some cases but not in others is either superfluous or else it is

inconsistent; unless Defendant sought to constrain its meaning in the former cases. There is no reason to believe that the words in the contract are superfluous or that they are incidentally inconsistent. Therefore, the best interpretation is that "third party" meaningfully limits the scope of the provisions in which it appears and that the provisions to which it is absent evince a different meaning.

For the reasons discussed above, Defendant's drafting of the contract to include and omit "third party" references in indemnity clauses controls the Court's reading of the contract. On this reading, the indemnification clause is not limited to third parties and because Plaintiff's claim arises under § 6.02, the damage cap provision in the PBI-Dealer Agreement does not apply. Accordingly, the Court does not address the merits of Plaintiff's third or fourth arguments.

### 2. Legal Limitations on Damages

Defendant argues that pursuant to either Connecticut or Virginia law, punitive damages are unavailable for breach of contract without an independent tort. As discussed above, Plaintiff has set forth a claim for fraud in the inducement (Count III) so these provisions are inapplicable. Plaintiff also seeks punitive damages with respect to the CUTPA claim. As discussed above, the CUTPA claim is dismissed so no damages analysis is necessary.

With respect to the fraudulent inducement claim, Defendant contends, and Plaintiff has not contested, that Virginia substantive law applies. Virginia Code § 8.01-38.1, which caps punitive damages to $350,000, applies to claims for fraud in the inducement. *See Wackenhut Applied Techs. Ctr., Inc. v. Sygnetron Prot. Sys., Inc.*, 979 F.2d 980, 983 (4th Cir. 1992). Therefore, Plaintiff's recovery for punitive damages is limited to $350,000.

## IV. Conclusion

For the reasons discussed above, the Court hereby GRANTS IN PART and DENIES IN PART Defendant's Motion. Specifically the Court:

- GRANTS the Motion with respect to Count II, Plaintiff's claim under CUTPA and it is DISMISSED;

- DENIES the Motion with respect to Count III, Plaintiff's claim for fraudulent inducement;

- DENIES the Motion with respect to the contractual limitations on damages and remedies;

- GRANTS the Motion with respect to capping punitive damages at $350,000.

Defendant shall file an answer to Counts I and III of the FAC within ten (10) days of the entry of the order accompanying this memorandum opinion.

March 31 , 2017
Alexandria, Virginia

/s/
Liam O'Grady
United States District Judge